**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MAMI CHELO FOUNDATION; ANDREW FREE,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and U.S. DEPARTMENT OF HOMELAND SECURITY – OFFICE OF INSPECTOR GENERAL,<br><br>Defendants. | Case No. 25-cv-2546<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

**Preliminary Statement**

1. Cristian Dumitrascu was a 50-year-old father of three from Romania who died in the custody of Defendant U.S. Immigration and Customs Enforcement ("ICE") on March 5, 2023. Mr. Dumitrascu was living in the Otay Mesa Detention Center ("OMDC") in San Diego, California.

2. Mr. Dumitrascu was dropped from his top bunk, directly leading to his death.

3. Mr. Dumitrascu's death is not an outlier. It is one of the many deaths of persons in ICE custody, which have alarmingly and horrifically increased over the past decade. ICE in-custody deaths have provoked significant and widespread public outcry for change, reform, and even abolition of ICE's deadly detention system. Mr. Dumitrascu's death is thus part of a larger systemic breakdown of the federal government's detention program.

4.      This is why Mr. Dumitrascu's case has become a significant part of a broader effort to prevent additional deaths under ICE's watch, including widespread efforts by Plaintiff Mami Chelo Foundation ("Mami Chelo") to inform the public about these issues and advocate for changes in the federal detention system.

5.      This action is brought pursuant to the Freedom of Information Act ("FOIA" or the "Act"), 5 U.S.C. § 552, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, to obtain improperly withheld records concerning Mr. Dumitrascu's untimely death, records pertaining to the federal government's response to Mr. Dumitrascu's death, and records generally concerning the in-custody deaths of other persons detained by ICE. Pursuant to various FOIA requests, Plaintiffs seek records from Defendants ICE and DHS Office of Inspector General ("DHS OIG," and together, "Defendants"). Defendants have both failed to adequately acknowledge Plaintiffs' various FOIA requests, as required by law, and have otherwise failed to adequately respond to Plaintiffs' FOIA requests, in violation of the Act.

6.      Plaintiffs seek a declaration that Defendants have improperly withheld records that will shed light on the circumstances surrounding Mr. Dumitrascu's death and similar abuses at ICE detention centers, and injunctive relief requiring Defendants to immediately process and release the requested records.

**JURISDICTION AND VENUE**

7.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 552(a)(4)(B). Plaintiffs' request for declaratory and other relief is properly subject to this Court's subject-matter jurisdiction pursuant to 5 U.S.C. § 552(a)(4)(F) and 28 U.S.C. §§ 1331, 2201(a), and 2202.

8. Venue is proper within this district under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1391(b)(1), (b)(2), and (e)(1).

9. Plaintiffs have constructively exhausted all administrative remedies in connection with their FOIA requests, as detailed below.

10. Because Plaintiffs bring this action after constructively exhausting administrative remedies, this Court's jurisdiction is based on 5 U.S.C. § 552(a)(4)(B) and 5 U.S.C. § 552(a)(6)(C)(i).

11. Under the latter provision, this Court may retain jurisdiction and allow Defendants additional time to complete the processing of Plaintiffs' FOIA requests if, and only if, the government can demonstrate exceptional circumstances exist ***and*** due diligence in responses to Plaintiffs' requests. Because Defendants can demonstrate neither, this Court has jurisdiction to declare unlawful the agencies' withholdings and order immediate production of records unlawfully withheld.

## PARTIES

12. Plaintiff Mami Chelo is 501(c)(3) non-profit organization based in New York, New York. Mami Chelo's mission is to inform the public about the immigration process and to assist individuals and communities who are attempting to participate in the lawful immigration system.[1] Mami Chelo was appointed by Mr. Dumitrascu's family following his death to serve as their attorney-in-fact for the recovery of records relating to his treatment in the immigration detention system. In addition, consistent with its mission, Mami Chelo has commissioned an independent analysis of the records it obtained, which will be published and widely disseminated amongst stakeholders and

---

[1] Mami Chelo Foundation, https://mamichelo.org/.

communities, to assess procedural violations, standards violations, and determine whether the quality of care he received was appropriate.

13. Plaintiff Andrew Free was contracted by Mami Chelo to conduct the civil society investigation into Mr. Dumitrascu's death.

14. Defendant ICE is an agency within the meaning of 5 U.S.C. § 551(1). ICE has possession, custody, and control of records responsive to Plaintiffs' FOIA requests.

15. Defendant DHS OIG is an agency within the meaning of 5 U.S.C. § 551(1). DHS OIG has possession, custody, and control of records responsive to one of Plaintiffs' FOIA requests.

**FACTS**

**Mr. Dumitrascu's Detention**

16. On February 22, 2023, the United States Customs and Border Protection ("CBP") arrested Mr. Dumitrascu near the Otay Mesa Port of Entry, in California, for his alleged involvement in noncitizen alien smuggling activity and for illegally entering the United States on September 1, 2019.

17. On February 23, 2023, CBP charged Mr. Dumitrascu with violating Section 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA"), as a noncitizen present in the United States without an immigrant visa or other valid entry documents, and issued him a Notice to Appear, Form I-862.

18. CBP's national standards on transport, escort, and detention and search ("TEDS") state that individuals should not be held in CBP custody for more than 72 hours in hold rooms or holding facilities.[2]

19. In violation of this standard, CPB did not transfer Mr. Dumitrascu into ICE custody until March 1, 2023.

20. The minority staff of the U.S. Judiciary Committee released a report on January 24, 2025 concluding that systemic problems at CBP hold facilities include that they are chronically understaffed and oversight is lacking:

> Whistleblowers and oversight offices, such as the DHS Office of Inspector General (OIG) and DHS Office of Civil Rights and Civil Liberties (CRCL), have attributed inadequate medical care in CBP facilities to, among other factors, understaffing, an inadequate electronic medical records system, and a lack of clarity related to roles and responsibilities in the delivery of medical care. In addition to inadequate medical care, oversight entities have highlighted dangers associated with longer stays in CBP custody. The length of time in custody may exacerbate existing medical care needs, create additional challenges for medical staff attending to the needs of large numbers of migrants, and create dangerous and untenable conditions in CBP facilities that were not designed for long-term detention.[3]

21. On March 1, 2023, CBP transferred Mr. Dumitrascu to ICE Enforcement and Removal Operations ("ERO"). ERO detained Mr. Dumitrascu at OMDC pending a hearing before an immigration judge.

---

[2] U.S. Customs and Border Protection, Fiscal Year 2023 Report to Congress, "Short Term Detention" (Jan. 11, 2023), https://www.dhs.gov/sites/default/files/2024-03/2024_0111_cbp_short_term_detention.pdf.

[3] Judiciary Minority Staff Report, "The Failure to Provide Adequate Care to Vulnerable Individuals in CBP Custody" (Jan. 24, 2025), https://www.judiciary.senate.gov/imo/media/doc/FINAL%20CBP%20Medical%20Care%20Report.pdf.

22.     That day, a registered nurse ("RN") completed Mr. Dumitrascu's initial intake screening and documented mildly elevated blood pressure of 135/74 millimeters of mercury, and slightly low heart rate of 59 beats per minute. The nurse also noted Mr. Dumitrascu's self-reported history of hepatitis B for ten years and use of medications. The nurse cleared Mr. Dumitrascu for general population with an appointment to see an advanced practice provider ("APP") the next day.

23.     Mr. Dumitrascu's medical records reflect that although he stated he had been taking medication for Hepatitis B, he received no medication at OMDC.

24.     Moreover, although the records from March 1, 2023 state that Mr. Dumitrascu spoke only Romanian, and his initial health assessment was conducted with a Romanian interpreter, other records state that he spoke English.[4]

25.     According to ICE, on March 3, 2023, an APP completed Mr. Dumitrascu's initial health assessment, and documented an unremarkable exam and Mr. Dumitrascu's denial of any past medical and mental health histories, illicit drug use, hospitalizations, or allergies.

26.     However, Mr. Dumitrascu was referred for a number of diagnostic panels based on his elevated blood pressure.

27.     Two days later, Mr. Dumitrascu died. No physician reviewed Mr. Dumitrascu's initial physical exam until nearly two months after he died.

---

[4] Inmate Condensed Chart Report, pg. 5, https://www.documentcloud.org/documents/ 25502779-dumitrascu-cristian-6115668-10jul2024-09-45-48-1/.

**Mr. Dumitrascu's Untimely Death**

28. On March 5, 2023, Mr. Dumitrascu was dropped from his top bunk, which led to his death.

29. The mortality review regarding his death found that, according to the mortality review committee, OMDC delayed initiating CPR for 6 minutes, calling 911 for 9 minutes, and initiating the Automated External Defibrillator ("AED") for 16 minutes. Before Mr. Dumitrascu's autopsy was reviewed, it was determined that this probably contributed to his death.[5]

30. According to the mortality review:

> A mortality review committee (MRC) determined the care OMDC provided Mr. [Dumitrascu] deviated beyond safe limits of practice. In addition, the MRC suspects, but could not conclude without an autopsy report, the care OMDC provided Mr. [Dumitrascu] directly contributed to his death.
>
> Specifically, the MRC determined the following: 1) OMDC staff deviated from Core Civic Emergency Response policy; 2) OMDF staff delayed CPR delivery during the emergency response; 3) OMDC staff delayed AED use during the emergency response; 4) OMDC staff did not secure the scene; 5) OMDC's health assessment notes lack defined parameters for areas assessed; 6) OMDC staff lacked the proper CPR technique, application, and skill; and 7) OMDC staff made a poor decision during the emergency response by moving Mr. [Dumitrascu] from the scene instead of remaining in place and prioritizing chest compression delivery.

31. Importantly, the mortality review provides a different timeline than was presented in the Detainee Death Report.

---

[5] U.S. Immigration and Customs Enforcement, Report of Findings - Mortality Review Cristian Dumitrascu, A236 302 355 (May 12, 2023), https://www.documentcloud.org/documents/25472204-dumitrascu-mortality-review-2024-icfo-28664-001/.

- 7 -

32. According to the mortality review, on March 5, 2023, at 12:03 a.m., a custody officer announced a medical emergency via radio in Mr. Dumitrascu's housing unit (K pod).

33. Two minutes later, at 12:05 a.m., one member of the OMDC health staff responded to Mr. Dumitrascu's medical emergency. According to the mortality review, Mr. Dumitrascu was in agonal breathing and snoring loudly.

34. At 12:07 a.m., OMDC health staff responded with a wheelchair and oxygen tank. An RN found Mr. Dumitrascu pulseless, unresponsive, in agonal breathing, snoring with foamy saliva around the corner of his mouth, and lying on his left side on the top bunk.

35. At 12:10 a.m., additional health staff responded to the unit with a gurney, emergency bag, and AED.

36. At 12:13 a.m., staff transferred Mr. Dumitrascu onto a gurney, instructed custody staff to call 911, and administered oxygen via a non-rebreather mask at 15 liters.

37. At 12:14 am, the responding staff initiated CPR.

38. At 12:15 a.m., the responding staff transported Mr. Dumitrascu to an urgent care room, applied the AED (no shock recommended), continued CPR for an unknown duration, and delivered oxygen via bag valve mask 15L.

39. At 12:18 a.m., health staff delivered an AED-recommended shock and continued CPR for an unknown duration.

40. At 12:19 a.m., health staff administered 0.4 milligrams of naloxone intranasally.

41. At 12:20 a.m., Mr. Dumitrascu remained pulseless and showed no sign of spontaneous breathing. The health staff continued CPR for an unknown duration and an RN documented Mr. Dumitrascu's elevated blood glucose level of 126 milligrams per deciliter.

42. At 12:24 a.m., responding staff transported Mr. Dumitrascu to OMDC's compound, and continued CPR.

43. At 12:30 a.m., San Diego Fire-Rescue Department ("SDFD") paramedics arrived at OMDC, assumed Mr. Dumitrascu's care, continued CPR, and administered advanced cardiac life support medications.

44. At 1:02 am, a Sharp Grossmont Hospital ("SGH") physician, in La Mesa, California, instructed SDFD paramedics to stop CPR and pronounced Mr. Dumitrascu deceased.

45. At 1:29 a.m., SDFD paramedics departed OMDC without Mr. Dumitrascu's body.

46. At 2:40 a.m., OMDC custody staff referred Mr. Dumitrascu's body to the San Diego Medical Examiner's Office ("SDMEO").

47. On March 6, 2023, at 11:28 a.m., SDMEO representatives transported Mr. Dumitrascu's body from OMDC to the San Diego County morgue.

48. In other words—as with several other ICE deaths—CoreCivic[6] personnel delayed calling 911 for at least 12 minutes after learning Mr. Dumitrascu was in medical distress—and for at least 9 minutes after discovering him pulseless. An incident report from Cal Fire reveals OMDC did not call 911 until 12:15 a.m. Two units

---

[6] CoreCivic provides detention services to ICE.

arrived on-site in 8 and 10 minutes, respectively, but did not take over CPR until 12:30 a.m.

49. A 911 call record Mami Chelo obtained from the San Diego Sheriff's Department showed CoreCivic did not call until 3:25 a.m.—more than two hours after Mr. Dumitrascu was pronounced dead. Even after CoreCivic called the Sheriff's Office to come get Mr. Dumitrascu's body, a question ensued about who would investigate his death.

50. According to the mortality review, the following were the weaknesses in the Emergency Response:

- The responding custody staff did not immediately recognize the need to check for a pulse or initiate CPR because "they saw Mr. [Dumitrascu] was breathing."
- The responding health staff did not respond to the scene with a mobile gurney containing the emergency kit, backboard, and AED.
- The responding custody staff relied solely on health staff to bring an AED to the medical emergency.
- The responding staff did not use an AED until approximately 16 minutes after discovering Mr. [Dumitrascu] was pulseless.
- The responding staff did not call 911 until nine minutes after discovering Mr. Dumitrascu was pulseless.
- ***Based on the video footage and witness testimonies, after transferring Mr. [Dumitrascu] to the gurney, the responding staff lacked clear communication and a plan for cohesively caring for Mr. [Dumitrascu].*** At the shift captain's request, the responding staff initiated CPR six minutes after discovering Mr. [Dumitrascu] did not have a pulse.
- The responding staff did not administer chest compressions during Mr. [Dumitrascu's] transport from his cell to the corridor.
- The responding staff used improper chest compression technique during Mr. [Dumitrascu's] transport from the corridor to the urgent care room and OMDC's compound.

- The responding staff did not participate in a debriefing after the emergency response.

Mortality Review at 5 (emphasis added).

51. Notably, the video footage in the emphasized portion above, upon which the mortality review was based, is precisely what Plaintiffs sought via FOIA requests and have been unlawfully denied.

52. However, there are facts showing that Mr. Dumitrascu was actually dropped from his top bunk, which led to his death.

53. At least seven residents of the housing pod, ranging in age from their twenties to fifties, who watched Mr. Dumitrascu die, reported to Mami Chelo in affidavits that Mr. Dumitrascu was dropped from the top bunk. A few of the men heard shouting about ten minutes before midnight, asking officers for help. Help arrived, with no apparent urgency, some five to ten minutes later.

54. The men who saw the nurses and guard trying and failing to lower Mr. Dumitrascu off the top bunk tried to help them, but the guard and nurses would not allow them inside.

55. Then, despite the absence from any investigative record, *all of the witnesses* said they heard or watched the nurses drop Mr. Dumitrascu to the floor, face down. The witnesses said that after Mr. Dumitrascu was finally placed on the gurney and rolled out, he was not breathing.

**Significant Public Interest**

56. Mr. Dumitrascu's death drew significant public outcry and media attention.[7]

57. Not only has Mr. Dumitrascu's death garnered significant public interest, but it is unfortunately another horrific example of a widespread issue of repeated in-custody deaths of persons detained by ICE.[8]

58. Mr. Dumitrascu's death is not an outlier. Over the past decade, there has been an increasing number of ICE in-custody deaths at detention facilities like OMDC. This pattern is alarming and has provoked widespread public outcry for change, reform, and even abolition of ICE's deadly detention system.

59. Given the alarming number of deaths of persons in ICE custody, it is not surprising that Mr. Dumitrascu's death has become another horrifying example of a larger systemic breakdown of the federal government's detention program. This is also

---

[7] *See, e.g.*, Detention Watch Network, "Family members and advocates demand answers from ICE on the death of father in their custody" (Mar. 9, 2023), https://www.detentionwatchnetwork.org/pressroom/releases/2023/family-members-advocates-demand-answers-ice-death-father-their-custody; THE BRUNSWICK NEWS, "Romanian citizen detained by ICE agents dies at Otay Mesa Detention Center (Mar. 7, 2023), https://thebrunswicknews.com/romanian-citizen-detained-by-ice-agents-dies-at-otay-mesa-detention-center/article_fb0885bc-e5e6-5a78-8095-7461d7fd2ef5.html; ABC 10 News San Diego, "Romanian citizen dies in ICE custody at Otay Mesa Detention Center" (Mar. 7, 2023), https://www.10news.com/news/local-news/south-bay-news/romanian-citizen-dies-in-ice-custody-at-otay-mesa-detention-center.

[8] *See, e.g.*, Cathrin E. Shoichet, "The death toll in ICE custody is the highest it's been in 15 years," CNN (Sept. 30, 2020), https://www.cnn.com/2020/09/30/us/ice-deaths-detention-2020/index.html; Grace Vitaglione & Sammy Sussman, "Families, activists, ACLU question ICE's accounting of deaths in detention," IRW: INVESTIGATIVE REPORTING WORKSHOP (Nov. 15, 2021), https://investigativereportingworkshop.org/investigation/dying-in-silence/.

why Mr. Dumitrascu's case is a significant part of a broader effort to prevent additional deaths under ICE's watch.

60. The records sought by Plaintiffs' FOIA requests are thus critical to informing the public about the process by which the U.S. government detains immigrants and thereafter ensures the safety and welfare of persons in its custody. These records also inform the public's significant interest in their government's decisions concerning the allocation and use of U.S. tax revenues for the detention of non-citizens.

### DEFENDANTS' UNLAWFUL FAILURE TO RESPOND TO PLAINTIFFS' FOIA REQUESTS

**FOIA Requests Regarding Cristian Dumitrascu**

*First FOIA Request: ICE*

61. On April 3, 2024, Plaintiff Andrew Free sent a FOIA request to ICE for the Mortality Review for Cristian Dumitrascu. ICE received this request on April 3, 2024, and acknowledged receipt on April 6, 2024, assigning Reference No. 2024-ICFO-28664. ICE informed Mr. Free that the request was "administratively closed" as a duplicate of a "previous" request. On April 16, 2024, Mr. Free informed the office that there was no such previous request, noted that it was likely an administrative error, and requested that it be re-opened.

62. On April 18, 2024, Mr. Free was informed that although ICE endeavors to respond within 20 business days of receipt of a request, FOIA permits a 10-day extension of this time. ICE apologized for the delay in processing the request on April 18, 2024. Mr. Free followed up about the status of this request on May 20, 2024, and

again on June 19, 2024, July 19, 2024, August 19, 2024, September 18, 2024, October 18, 2024, November 18, 2024, and December 18, 2024.

***Second FOIA Request: ICE***

63. On July 2, 2024, Mr. Free sent another FOIA request to ICE for medical records and video generated between March 1, 2023 and March 5, 2023 regarding the in-custody death of Mr. Dumitrascu at OMDC on March 5, 2023.

64. The office received this request on July 2, 2024. On July 12, 2024, Mr. Free was informed that although ICE endeavors to respond within 20 business days of receipt of a request, FOIA permits a 10-day extension of this time. Mr. Free followed up about the status of this request on October 10, 2024 and again on January 8, 2025.

65.

66. The Second ICE FOIA Request sought the release of the following records:

   a. video from OMDC from March 1, 2023 – March 5, 2023 showing Cristian Dumitrascu, who died on March 5, 2023; and

   b. Mr. Dumitrascu's ICE medical records.

***Appeals of Constructive Denial of FOIA Requests to ICE***

67. On November 13, 2024, the undersigned counsel wrote to the Office of the Principal Legal Advisor, Government Information Law Division, to appeal the constructive denial of the First and Second ICE FOIA Requests.

68. On December 30, 2024, ICE released certain records.

69. On January 20, 2025, Mr. Free wrote to "appeal all the withholdings in the records released December 30, 2024." ICE received this letter on February 7, 2025.

- 14 -

70. To date, ICE still has not produced adequate documents in response to the First FOIA Request to ICE, and has not produced any documents in response to the Second FOIA Request to ICE.

***Third FOIA Request: DHS OIG***

71. On April 24, 2024, Mr. Free sent a FOIA request to DHS OIG, seeking notification, investigation, or reports regarding the March 5, 2023 death of Mr. Dumitrascu in ICE custody at OMDC.

72. The DHS FOIA Request sought the release of "[n]otification, investigation, or reports regarding the March 5, 2023, death of Cristian Dumitrascu in ICE custody at the Otay Mesa Detention Center in San Diego."

73. The office acknowledged receipt of this request on May 7, 2024. Mr. Free was informed that although DHS OIG endeavors to respond within 20 business days of receipt of a request, FOIA permits a 10-day extension of this time.

74. Mr. Free followed up about the status of this request on June 6, 2024, and again on July 8, 2024, August 7, 2024, September 6, 2024, October 7, 2024, November 6, 2024, and December 6, 2024.

75. On December 9, 2024, the DHS OIG FOIA Team wrote that the "FOIA request is in the records search phase."

76. Mr. Free again followed up about the status of this request on January 8, 2025 and February 7, 2025.

77. The DHS OIG FOIA Team wrote on February 7, 2025 that the "FOIA is in the records review phase now." Mr. Free responded that day, asking for "an estimated date of production[.]"

78.     To date, DHS has not produced any documents in response to the Third FOIA Request.

*The Agencies' Failure to Respond to the FOIA Requests*

79.     As of the date of this filing – 358 days after the initial request was submitted – neither DHS nor ICE has produced adequate records in response to the First FOIA Request to ICE, nor any records at all in response to the Second FOIA Request to ICE or the Third FOIA Request to DHS (together, the "FOIA Requests"), in violation of FOIA.

80.     With respect to FOIA Requests, and despite the significant public interest in Mr. Dumitrascu's death as articulated herein, ICE and DHS have failed to (1) notify Plaintiffs of any determination regarding the FOIA Requests, including the full scope of any responsive records the agencies intend to produce or withhold and the reasons for any withholdings, thereby violating the timing requirements of FOIA; and (2) produce all relevant requested records or alternatively demonstrate that the requested records are lawfully exempt from production as required by FOIA.

81.     Plaintiffs have constructively exhausted administrative remedies because ICE and DHS have failed to make a determination in response to the FOIA Requests within the time period required by law.

82.     Given these facts, Plaintiffs seek immediate judicial review.

## CLAIMS FOR RELIEF

### COUNT I
### FAILURE TO MAKE DETERMINATION
### VIOLATION OF 5 U.S.C. § 552

83.     Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs as if fully set forth herein.

84. FOIA requires an agency to make a determination within a maximum of 30 working days under *Citizens for Responsibility & Ethics in Washington v. Federal Election Commission ("CREW")*, 711 F.3rd 180 (D.C. Cir. 2013) (Kavanaugh, J.).

85. "[I]n order to make a 'determination' and thereby trigger the administrative exhaustion requirement, the agency must at least: (i) gather and review the documents; (ii) determine and communicate the scope of the documents it intends to produce and withhold, and the reasons for withholding any documents; and (iii) inform the requester that it can appeal whatever portion of the 'determination' is adverse." *Id.* at 188.

86. Both ICE and DHS OIG have failed to make a determination.

## COUNT II
## VIOLATION OF 5 U.S.C. § 552(a)(7)(B)(ii)

87. Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs as if fully set forth herein.

88. Defendants must establish a telephone line or internet service to provide an estimated date on which the agencies will complete action on the request.

89. In violation of this statute, Defendants failed to provide an estimated date on which the requests would be completed.

## COUNT III
## VIOLATION OF 5 U.S.C. § 552(a)(3)

90. Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs as if fully set forth herein.

91. Upon request, an "agency … shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A).

92. Defendants have violated this provision by failing to make records "promptly available."

## COUNT IV
## PATTERN AND PRACTICE OF VIOLATION OF TIME LIMITS

93. Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs as if fully set forth herein.

94. Defendants have established a pattern and practice of violating statutory time limits.

95. Courts have previously granted judgment as matter of law to the family member of someone who died in ICE custody, explaining that "promptly available" "typically would mean within days or a few weeks of a 'determination,' not months or years." *Sierra Club v. U.S. Env't Prot. Agency*, 2018 WL 10419238, at *5 (N.D. Cal. Dec. 26, 2018) (quoting *CREW*, 711 F.3d at 188); *Owen v. U.S. Immigration & Customs Enforcement*, 2023 WL 9470904, at *6 (C.D. Cal. Jan. 12, 2023).

## COUNT V
## VIOLATION OF 5 U.S.C. § 552(a)(4)(B)
## UNLAWFUL WITHHOLDING OF AGENCY RECORDS BY ICE

96. Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs as if fully set forth herein.

97. ICE is a government agency subject to FOIA and must therefore make reasonable efforts to search for and release requested records and otherwise lawfully support and provide the basis for any withholdings made pursuant to the exemptions provided by FOIA.

98. Plaintiffs have a legal right under FOIA to the timely search and release of responsive, non-exempt agency records responsive to the ICE FOIA Requests.

## COUNT VI
### VIOLATION OF 5 U.S.C. § 552(a)(4)(B)
### UNLAWFUL WITHHOLDING OF AGENCY RECORDS BY DHS OIG

99. Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs as if fully set forth herein.

100. Plaintiffs have a legal right under FOIA to the timely search and release of responsive, non-exempt agency records responsive to the DHS OIG Death Investigation FOIA Request.

101. There is no legal basis for DHS OIG's failure to adequately and timely search for and release responsive agency records in compliance with FOIA's time limits.

102. DHS OIG's failure to make reasonable and timely efforts to search for and release responsive agency records constitutes an unlawful withholding under the Act that this Court can and should remedy through declaration and injunction.

103. DHS OIG's failure to initiate an adequate search and substantively respond to the DHS OIG Death Investigation FOIA Request within the timeframe allowed by law violates FOIA.

104. Because DHS OIG has failed to comply with the Act's time limits, Plaintiffs have constructively exhausted their administrative remedies.

105. Plaintiffs are therefore entitled to injunctive and declaratory relief requiring DHS OIG to promptly make reasonable efforts to search for and produce records responsive to the DHS OIG FOIA Request.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1. enter judgment on all counts in favor of Plaintiffs and against Defendants;

2. declare Defendants' withholdings under FOIA unlawful and enjoin Defendants from continuing to withhold all non-exempt records responsive to the FOIA Requests;

3. order Defendants to make a determination as required by FOIA;

4. order Defendants to conduct a prompt and adequate search for all records responsive to the FOIA Requests, determine which, if any, portions of such are records are exempt, and require Defendants to release the remaining portions of these agency records;

5. order Defendants to produce, within 20 days of the Court's order, or by such other date as the Court deems appropriate, all non-exempt records responsive to the FOIA Requests, all segregable records responsive to the FOIA Requests, and indices justifying the withholding of any responsive records withheld under any claim of exemption;

6. award Plaintiffs reasonable costs and attorneys' fees pursuant to 5 U.S.C. § 552(a)(4)(E) and/or 28 U.S.C. § 2412(d)(1)(A); and

7. award Plaintiffs such further relief as the Court deems just, equitable, and appropriate.

Dated: March 27, 2025
    New York, NY

POLLOCK COHEN LLP

By: /s/ *Anna Menkova*
   Adam Pollock
   Anna Menkova
111 Broadway, Suite 1804
New York, NY 10006
(212) 337-5361
Adam@PollockCohen.com
Anna@PollockCohen.com